No. 89-447

IN THE SUPREME COURT OF THE STATE OF MONTANA

1990

SIMMONS OIL CORPORATION and
SIMMONS REFINING CORPORATION,
    Plaintiffs and Appellants,
-vs-
HOLLY CORPORATION; NAVAJO REFINING
COMPANY; NAVAJO NORTHERN, INC.;
WELLS FARGO BANK, N.A.,
    Defendants and Respondents.

APPEAL FROM:   District Court of the Eighth Judicial District,
               In and for the County of Cascade,
               The Honorable Joel G. Roth, Judge presiding.

COUNSEL OF RECORD:

       For Appellants:

           James H. Goetz argued, Goetz, Madden & Dunn,
           Bozeman, Montana
           Charles J. Wisch argued, Weissburg & Aronson, Inc.,
           San Francisco, California
           H. Charles Stahmer, Bozeman, Montana

       For Respondent:

           Sheldon Oliensis argued, Kaye, Scholer, Fierman,
           Hays & Handler, New York, New York (Holly Corp.)
           Richard F. Gallagher, Church, Harris, Johnson &
           Williams, Great Falls, Montana (Holly Corp.)
           Steve M. Perry argued, Munger, Tolles & Olson, Los
           Angeles, California (Wells Fargo)
           John D. Stephenson, Jr., Jardine, Stephenson,
           Blewett & Weaver, Great Falls, Montana (Wells Fargo)

FILED

JUL 1 9 1990

*Ed Smith*
CLERK OF SUPREME COURT
STATE OF MONTANA

Submitted:  February 6, 1990

Decided:  July 19, 1990

Filed:

                          Clerk

Justice William E. Hunt, Sr. delivered the Opinion of the Court.

Plaintiffs Simmons Oil Corporation and Simmons Refining Corporation appeal from an order of the Eighth Judicial District Court, Cascade County, dismissing their complaint against defendants Holly Corporation and Wells Fargo Bank, N.A., for lack of personal jurisdiction. We reverse.

The following issues are raised on appeal:

1. Whether sufficient minimum contacts exist with the state of Montana to subject defendant Wells Fargo to personal jurisdiction.

2. Whether sufficient minimum contacts exist with the state of Montana to subject defendant Holly to personal jurisdiction.

Plaintiff Simmons Oil Corporation (SOC) is an Arizona corporation with a principal place of business in that state. Plaintiff Simmons Refining Corporation (SRC), a wholly-owned subsidiary of SOC, is a Delaware corporation that appears from the discovery documents to have a principal place of business in Arizona although it alleges in the complaint that its principal place of business is in Montana. (Hereafter, the plaintiffs will be referred to collectively as "Simmons" unless the need arises to differentiate between the two entities.)

Defendant Holly is a Delaware corporation with a principal place of business in Texas. It is not registered to do business in Montana, does not maintain offices, representatives or agents in this state and does not solicit business in this state.

2

Defendant Navajo Refining Company is a wholly owned subsidiary of Holly and Holly's wholly owned subsidiary, Navajo Corporation. It is a Delaware corporation, headquartered in New Mexico. Defendant Navajo Northern, Incorporated, a Nevada corporation, is wholly owned by Navajo Refining.

Defendant Wells Fargo is a national banking association with a principal place of business in California. It is not registered to do business in Montana and does not maintain any subsidiaries, offices, branches, employees, agents or representatives in this state.

Beginning in 1980, Wells Fargo provided SOC, and later SRC and related entities, a line of credit. In early 1982, Simmons purchased, and SRC began to operate, the Black Eagle Refinery located in Cascade County near Great Falls. Prior to the purchase, Wells Fargo agreed to extend Simmons an additional $18-million line of credit to be used for working capital and acquisition of inventory for the refinery. Simmons pledged all of its accounts receivable and inventory to secure the loan.

In 1983, Wells Fargo filed in four Montana counties at least 10 UCC financial statements, constituting security interests in Simmons' inventory, equipment, fixtures, accounts receivable and other personal property located in these counties. In that same year, Simmons gave Wells Fargo a mortgage on the refinery, which Wells Fargo recorded in Montana.

In 1983 and 1984, Simmons encountered financial difficulties and Wells Fargo took control of the refinery's operation. During

this time, Wells Fargo urged Simmons to search for a partner to operate and provide capital for the refinery.

In 1984, Simmons, Wells Fargo, Holly, Navajo Refining and Navajo Northern entered into a Master Agreement, which authorized the formation of Montana Refining Company, a limited partnership organized under the laws of Montana. Pursuant to the terms of the agreement, the refinery was transferred to Montana Refining. Navajo Northern became the sole general partner and took control of the refinery. SRC became the sole limited partner and assumed a passive role in the refinery's operation.

The formation of Montana Refining entailed a series of debt transactions between the parties. In one transaction, Montana Refining assumed $5 million of Simmons' debt to Wells Fargo. The loan assumption and accompanying security agreement were deemed to have been made in Montana and governed by Montana laws. Wells Fargo agreed to venue in Montana and waived the right to object to venue or assert the doctrine of forum non conveniens.

Holly guaranteed this debt on behalf of Montana Refining. The guaranty was deemed a Montana agreement, governed by Montana laws. The agreement provided that jurisdiction and venue would be in Montana.

In collateral agreements, Simmons executed a $6.5-million replacement credit note in favor of Wells Fargo, which reduced Simmons' existing $21.8-million debt. The replacement credit note, which was secured by a mortgage on the refinery, was to be paid by 100 percent of the share of Simmons' cash flow from Montana

Refining up to the first $700,000 each fiscal year. The agreement also provided that Wells Fargo would be entitled to 100 percent of Simmons' share of the Montana Refining partnership property in the event of liquidation of the company. The agreement recited that it was made, executed and entered into within the state of Montana and governed by Montana laws.

In another agreement, Simmons pledged all of its right, title and interest in Montana Refining to Wells Fargo, including its right to receive distributions of money and property other than money from Montana Refining. In addition, Simmons sold, assigned and transferred to Wells Fargo "as outright owner" all distributions of money or other property made by Montana Refining to Simmons. This agreement was governed by the laws of California.

In 1985, Wells Fargo and Simmons restructured Simmons' total debt. In conjunction with the restructuring, Wells Fargo agreed to release Jerry Simmons, SOC's sole shareholder, from his personal guarantee of Simmons' indebtedness. In return, Jerry Simmons and SOC, but not SRC, agreed to release Wells Fargo from "any and all debts, claims, demands, liabilities, obligations, cause or causes of action, known or unknown . . ." that arose prior to the date of the release. The restructuring agreement provided for the application of California law.

A condition of the $5-million loan assumption by Montana Refining required the company to obtain the express written approval of Wells Fargo before making any plant or fixed capital expenditure or before purchasing any real or personal property in

5

excess of $200,000. Pursuant to this provision, Wells Fargo approved Montana Refining's 1985 and 1986 budgets and, in 1987, it approved the funding for a capital expenditure project, a project that was financed by Holly. In 1985 and 1986, two employees from Wells Fargo traveled to Montana to meet with refinery officials and local bankers concerning future production of the refinery.

On January 1, 1988, Holly and Wells Fargo negotiated, outside of the state of Montana, the sale of the Simmons' debt and the $5-million Montana Refining debt. Holly purchased the debt for approximately $2.5-million cash plus a promise to pay up to $2.8 million from Montana Refining's future cash flow. As part of the agreement, Wells Fargo transferred to Holly all of its security interest in the refinery, the refinery's inventory and other real property belonging to the Simmons entities located in Montana. Holly recorded the security interests in Montana.

Simmons filed this action in the Cascade County District Court, alleging that Holly and Wells Fargo wrongfully refused to allow it to purchase the debt on the same terms given to Holly. Simmons sought damages from Holly for breach of fiduciary duty, bad faith and conversion and from Wells Fargo for breach of fiduciary duty and bad faith. It also claimed that each of the defendants had conspired to deprive Simmons of the benefit of the various agreements they had entered into with Simmons.

Holly and Wells Fargo both moved to dismiss for lack of personal jurisdiction. (The remaining two defendants, Navajo Refining and Navajo Northern, did not contest jurisdiction.) After

6

a hearing, the District Court granted the motion and dismissed the actions against Holly and Wells Fargo. The court denied Simmons' subsequent motion for reconsideration, but certified the dismissal for immediate appeal.

## I. PRELIMINARY DISCUSSION

In Simmons v. State, 206 Mont. 264, 271, 670 P.2d 1372, 1376 (1983), we noted that the determination of whether jurisdiction may be exercised over a nonresident defendant involves a two-part analysis. The court must first examine the long-arm statute to ascertain whether the defendant's activities fall within the provisions of the statute. If the defendant's activities comply with the long-arm statute, the court must then discern whether the exercise of jurisdiction comports with the traditional notions of fair play and substantial justice embodied in the due process clause. Simmons, 206 Mont. at 271, 670 P.2d at 1376.

Montana's long-arm statute is codified at Rule 4B(1), M.R.Civ.P., which provides:

> All persons found within the state of Montana are subject to the jurisdiction of the courts of this state. In addition, any person is subject to the jurisdiction of the courts of this state as to any claim for relief arising from the doing personally, through an employee, or through an agent, of any of the following acts:
>
> (a) the transaction of any business within this state;
>
> (b) the commission of any act which results in the accrual within this state of a tort action;
>
> (c) the ownership, use or possession of any property, or of any interest therein, situated within this state;
>
> (d) contracting to insure any person, property or risk located within this state at the time of contracting;

(e) entering into a contract for services to be rendered or for materials to be furnished in this state by such person; or

(f) acting as director, manager, trustee, or other officer of any corporation organized under the laws of, or having its principal place of business within this state, or as personal representative of any estate within this state.

Rule 4B(1), M.R.Civ.P., incorporates the principles of both general and specific jurisdiction. The first sentence deals with the question of general jurisdiction, that is, whether the party can be "found within" the state. A party is "found within" the state if he or she is physically present in the state or if his or her contacts with the state are so pervasive that he or she may be deemed to be physically present there. A nonresident defendant that maintains "substantial" or "continuous and systematic" contacts with the forum state is found within the state and may be subject to that state's jurisdiction even if the cause of action is unrelated to the defendant's activities within the forum. Simmons, 206 Mont. at 276, 670 P.2d at 1378 (quoting Data Disc, Inc. v. Systems Tech. Assoc., Inc., 557 F.2d 1280, 1287 (9th Cir. 1977)).

The remainder of Rule 4B(1), M.R.Civ.P. addresses the concept of specific jurisdiction. Under this theory, jurisdiction may be established even though a defendant maintains minimum contacts with the forum as long as the plaintiff's cause of action arises from any of the activities enumerated in Rule 4B(1), M.R.Civ.P. and the exercise of jurisdiction does not offend due process. Simmons, 206 Mont. at 276, 670 P.2d at 1378 (1983).

8

## II. GENERAL JURISDICTION

After examining the pleadings, affidavits and discovery documents on record, we hold that Simmons has not established that the contacts of either Holly or Wells Fargo are so substantial that they may be found within the state of Montana for purposes of general jurisdiction. Neither Holly nor Wells Fargo is registered to do business in the state. Neither maintains bank accounts, offices, employees or agents in the state. Neither solicits business in the state. With the exception of UCC filings recorded by Wells Fargo in the early 1970s, neither Wells Fargo nor Holly have had any contacts with Montana other than through their involvement with the Black Eagle Refinery.

## III. SPECIFIC JURISDICTION

Jurisdiction Over Wells Fargo. Although we hold that the contacts that Wells Fargo maintained with the state of Montana were not substantial enough to justify the exercise of general jurisdiction, we do hold that specific jurisdiction is warranted. Wells Fargo maintained minimum contacts from which the causes of action alleged by Simmons arose, making the exercise of specific jurisdiction reasonable.

In Columbia Falls Aluminum Co. v. Hindin/Owne/Engelke, Inc., 224 Mont. 202, 728 P.2d 1342 (1986), we held that jurisdiction could be properly exercised over a nonresident bank because the defendant transacted business in the state within the meaning of Rule 4B(1)(a), M.R.Civ.P. The defendant in Columbia Falls was an investment banking firm incorporated in the state of California,

with offices in California. It was approached in California by the plaintiff, a California resident, regarding the plaintiff's attempt to locate a lender to provide an operating loan for an aluminum reduction facility located in Columbia Falls, Montana. The collateral for the loan was to be the Columbia Falls plant itself. By contract executed in California, the defendant agreed to attempt to locate a lender for the venture. On two occasions, an officer of the defendant traveled from California to Montana to assist prospective lenders in their examination of the Columbia Falls plant.

Likewise, we hold that Wells Fargo's ventures into and affecting the state of Montana constitute the transaction of business within the meaning of Rule 4B(1)(a), M.R.Civ.P. In 1982, Wells Fargo provided Simmons with an $18-million line of credit to be used specifically for working capital and acquisition of inventory for the Black Eagle Refinery. It secured its loan to Simmons by taking security interests in the refinery property and recording those interests in Montana. In 1983 and 1984, it exercised financial control over the refinery. Subsequently, it engaged in a series of debt transactions with Simmons, Holly and Montana Refining, all of which pertained to and affected the Black Eagle Refinery and many of which were deemed to be Montana agreements, governed by Montana law and subject to Montana venue. Through these transactions, Wells Fargo became the "outright owner" of Simmons' share of the distributions from the Montana refinery. It also acquired the authority to approve and actually did approve

the refinery's capital budget and expenditures in excess of $200,000. On at least four occasions, it sent employees to Montana to discuss the future of the refinery.

Because we have found that Wells Fargo engaged in one of the activities enumerated in Rule 4B(1), M.R.Civ.P., we must now decide whether the exercise of jurisdiction over Wells Fargo would offend traditional due process notions of fair play and substantial justice. In Simmons, 206 Mont. at 276, 670 P.2d at 1378, we adopted the Ninth Circuit test for determining whether the exercise of jurisdiction comports with due process:

(1) The nonresident defendant must do some act or consummate some transaction with the forum or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking its laws.

(2) The claim must be one which arises out of or results from the defendant's forum-related activities.

(3) The exercise of jurisdiction must be reasonable.

The plaintiff need not demonstrate each of the above three elements to establish jurisdiction. Once the plaintiff shows that the defendant has purposefully availed itself of the privilege of conducting activities in the forum, a presumption of reasonableness arises, which the defendant can overcome only by "presenting a compelling case that jurisdiction would be unreasonable." Brand v. Menlove Dodge, 796 F.2d 1070, 1074 (9th Cir. 1986). On the other hand, jurisdiction may be established where the defendant has not purposefully directed its activities toward the forum but "has created sufficient contacts to allow the state to exercise personal jurisdiction if such exercise is sufficiently reasonable." Brand,

11

796 F.2d at 1074.

A nonresident defendant purposefully avails itself of the benefits and protections of the laws of the forum state when it takes voluntary action designed to have an effect in the forum. Boit v. Emmco Ins. Co., 271 F.Supp. 366, 369 (D. Mont. 1967). See also Farmers Ins. Exch. v. Portage La Prairie Mutual Ins. Co., No. 89-35409 (9th Cir. July 9, 1990). Conversely, a defendant does not purposefully avail itself of the forum's laws when its only contacts with the forum are random, fortuitous, or attenuated or due to the unilateral activity of a third party. Brand, 796 F.2d at 1074. The defendant that invokes the laws of the forum state by purposefully availing itself of the privilege of conducting activities within the forum should reasonably anticipate being haled into court in the forum state. Therefore, the exercise of jurisdiction over such a defendant is fundamentally fair.

Generally, a creditor's minimal entry into the forum to protect its interests does not constitute a voluntary effort to do business in the state. Occidental Fire & Casualty Co. of North Carolina v. Continental Illinois Nat'l Bank and Trust Co. of Chicago, 689 F.Supp. 564, 567 (E.D.N.C. 1988). In the present case, however, Wells Fargo's entry into the state of Montana cannot be described as minimal. Its affiliation with Simmons, an affiliation that substantially affected property in Montana, extended far beyond that of the simple creditor-debtor relationship. Wells Fargo loaned Simmons large sums of money, knowing these funds were destined for Montana. It protected its

12

interests by exercising financial control over the refinery, retaining the authority to approve expenditures of the refinery and becoming the outright owner of Simmons' profits from the refinery. Moreover, in many of the agreements it undertook with Simmons it specifically agreed to the application of Montana law. In short, Wells Fargo purposefully availed itself of the privilege of conducting activities in this state when it voluntarily engaged in affirmative conduct directed toward this state.

Since we have found that Wells Fargo satisfied the first prong of the due process analysis, we must move on to the second prong of the test, that is, whether the claims arose out of or resulted from Wells Fargo's forum-related activities. Wells Fargo argues that the claims in the present case arose out of the 1988 sale of Simmons' debt by Wells Fargo to Holly, a sale that was negotiated outside of the state of Montana.

Wells Fargo's argument focuses too narrowly on the 1988 transaction and ignores the forum-related activities it engaged in that culminated in Simmons' claims against it. To ascertain whether a cause of action arises out of a defendant's forum-related activity, this Court reviews the entire chain of events leading up to the final act upon which the claim accrued. See Nelson v. San Joaquin Helicopters, 228 Mont. 267, 742 P.2d 447 (1987). Accord United States Ry. Equip. Co. v. Port Huron and Detroit R.R. Co., 495 F.2d 1127, 1129 (7th Cir. 1974); Consolidated Laboratories, Inc. v. Shandon Scientific Co., 384 F.2d 797, 801 (7th Cir. 1967).

13

Simmons' claims against Wells Fargo for breach of fiduciary duty and bad faith arose out of the parties' course of dealing concerning the Black Eagle Refinery. This course of dealing establishes Simmons' claims, if any, against Wells Fargo, including acts that demonstrate Simmons' rights, Wells Fargo's duties and Wells Fargo's breach of duty. The sale of debt, the act that constituted Wells Fargo's alleged breach of duty, was merely the final act in the chain.

Wells Fargo further argues that Simmons cannot allege any claims against it relating to actions performed by Wells Fargo prior to 1985 because the restructuring agreement entered into by the parties in that year released Wells Fargo from all "debts, claims, demands, liabilities, obligations [and] cause or causes of action . . . ." We note, however, that only SOC agreed to release Wells Fargo from liability. SRC did not so agree. Furthermore, the claims in this action did not accrue until 1988, the time of the alleged breach. The fact that SOC released Wells Fargo from liability for claims accruing prior to 1985, does not prevent us from examining the chain of events leading up to the causes of action that accrued after 1985 in order to determine whether, for jurisdictional purposes, Simmons' claims arise out of Wells Fargo's forum-related activity.

The third prong of the due process analysis requires that the exercise of jurisdiction must be reasonable. In Jackson v. Kroll, Pomerantz and Cameron, 223 Mont. 161, 166, 724 P.2d 717, 721 (1986), we enumerated several factors to be considered when

14

examining the reasonableness of jurisdiction:

1. The extent of defendant's purposeful interjection into Montana;

2. The burden on defendant of defending in Montana;

3. The extent of the conflict with the sovereignty of defendant's state;

4. Montana's interest in adjudicating the dispute;

5. The most efficient resolution of the controversy;

6. The importance of Montana to plaintiff's interest in convenient and effective relief; and

7. The existence of an alternative forum.

The above factors are not mandatory tests, each of which the plaintiff must pass in order for the court to assume jurisdiction. Rather, the factors simply illustrate the concept of fundamental fairness, which must be considered in each jurisdictional analysis. Gates Learjet Corp. v. Jensen, 743 F.2d 1325, 1332 (9th Cir. 1984), cert. denied, 471 U.S. 1066 (1985).

Furthermore, because Simmons has demonstrated that Wells Fargo purposefully directed its activities toward this state, a presumption that the exercise of jurisdiction is reasonable has arisen. Wells Fargo must therefore present a compelling case establishing that jurisdiction is unreasonable. Brand, 796 F.2d at 1074. Wells Fargo has failed to meet its burden.

First, as we have already noted, Wells Fargo engaged in extensive activity directed toward this state. It loaned Simmons large sums of money to be used in the operation of a Montana refinery, exercised control of the refinery, executed agreements invoking Montana law and received Simmons' share of the

15

distributions from the refinery.  Considering the extent of these contacts, we hold that Wells Fargo purposefully interjected itself into this state and is subject to Montana's long-arm jurisdiction.

Second, Wells Fargo will not be greatly burdened by defending this action in Montana.  It appears that Simmons could have properly brought this case in either California or Texas, in addition to Montana.  Therefore, even if Montana were to reject jurisdiction, Wells Fargo might very well be forced to defend the case outside of its state of residence and its burden of defending the action would not be any less.

Third, Montana can provide as efficient a resolution of the controversy as either of the alternate forums.  It appears that the witnesses and evidence are spread among the states of Montana, Texas, Arizona, California and New Mexico.  Thus, it is hard to definitively state that jurisdiction would be most efficiently exercised in any one particular state.  Fourth, Wells Fargo has failed to allege any conflict with the sovereignty of California, its state of residence.

Finally, Montana has an interest in adjudicating the dispute because the outcome of the litigation may have an impact on the ownership of a refinery located within the state.  Furthermore, Montana is interested in protecting and regulating the conduct of parties who do business within the state, even if the parties are not residents of the state.

In sum, we hold that the state of Montana may properly exercise jurisdiction over Wells Fargo.  It is not unreasonable to

subject Wells Fargo to the jurisdiction of this state in light of the fact that Wells Fargo purposefully availed itself of the benefits and protections of Montana laws by transacting business in the state and the fact that the claims alleged by Simmons arose from Wells Fargo's transaction of business here.

Jurisdiction Over Holly. We now turn to the question of jurisdiction over Holly. Like Wells Fargo, we hold that Holly may properly be subject to the jurisdiction of the courts of this state under the theory of specific jurisdiction.

Holly transacted business in the state within the meaning of Rule 4B(1)(a), M.R.Civ.P. Holly entered into an agreement to create Montana Refining, a Montana partnership; loaned money directly to Montana Refining; and guaranteed loans on behalf of Montana Refining. All of these transactions were agreed to be governed by Montana law and subject to venue in Montana. Pursuant to its loan agreements with Montana Refining, Holly filed UCC financial statements in Montana.

The partnership agreement and the loan agreement provided Holly with the right to monitor, at least on a limited basis, the operations of Montana Refining. Specifically, the partnership agreement gave Holly the discretion to determine when certain process supplies could be used for production and the loan agreement gave Holly the power to authorize plant or fixed capital expenditures in excess of $200,000. In addition, Holly directly intervened on Montana Refining's behalf on at least one occasion when, in 1987, it contacted Wells Fargo to obtain approval for a

17

capital expenditure project.

Following the 1988 sale of Simmons' debt, Wells Fargo transferred its security interests in Montana Refining property to Holly and Holly recorded those interests in Montana. After the 1988 debt transaction, Holly represented in its financial statements that it "effectively acquired the limited partner's [SRC's] 50% interest in Montana Refining for the foreseeable future."

Holly's contacts with Montana constitute the transaction of business within the meaning of Rule 4B(1)(a), M.R.Civ.P. They also demonstrate that Holly purposefully availed itself of the benefits and protections of Montana law. Holly voluntarily stepped outside of the protection of its own jurisdiction and took affirmative steps to conduct business affecting Montana. It also invoked the laws of Montana to protect its own interests. In light of these actions, Holly should reasonably have anticipated being haled into court in this state.

For the reasons we stated in our analysis concerning Wells Fargo, the causes of action alleged by Simmons arise out of Holly's forum-related activities. Simmons' claims rest upon allegations of bad faith and breach of fiduciary duty. In order to determine the validity of these claims, the relationship between Simmons and Holly must be examined. Because the relationship between the parties centers upon their involvement in the Black Eagle Refinery, the claims of bad faith and breach of fiduciary duty arise out of Holly's forum-related activities.

18

Again for the same reasons as those used in our earlier discussion concerning Wells Fargo, jurisdiction over Holly would be reasonable in this case. Even if we decline to exercise jurisdiction, Holly may have to travel outside of Texas, its state of residence, to California to defend this action. Considering the convenience of modern travel, it is no more burdensome on Holly to litigate this action in Montana than it is to litigate in California.

As we have already stated, Montana can provide as efficient a resolution to this controversy as the alternate jurisdictions. Furthermore, Montana has an interest in litigating disputes between parties conducting business in the state when that dispute affects property located in this state.

Holly has failed to present a compelling case that subjecting it to jurisdiction for causes of action arising from business transacted in this state would be unreasonable. Due process will not be offended by the exercise of jurisdiction over this defendant.

Reversed and remanded for further proceedings consistent with this Opinion.

_____
Justice

We Concur:

_____
Chief Justice

19

_John Conway Harrison_

_John C. Sheehy_

_R. C. McKenney_

_Fred J. Weber_

_____
Justices

Justice Diane G. Barz, dissenting.

I respectfully dissent from the majority opinion. I would affirm the District Court's conclusion that there is no general or specific jurisdiction over Wells Fargo and Holly in Montana. Now the Eighth Judicial District Court is faced with yet another complex case to handle in an inadequately funded and overburdened system involving an out-of-state corporate plaintiff and two out-of-state corporate defendants.

The plaintiffs' complaint is predicated on the defendants' alleged tortious acts resulting from a 1988 purchase agreement wherein Wells Fargo sold the plaintiffs' debt of over $24 million to Holly. Wells Fargo is a California bank and Holly is a Texas corporation. The contract was negotiated and executed in Texas. Prior to the debt purchase, the plaintiffs were involved in discussions in Arizona.

At the time the complaint was filed, Wells Fargo had no assets, property, offices, agents, representatives or employees in Montana. Furthermore, at the time of filing of the complaint all of their recorded security interests had been transferred. The plaintiffs cannot satisfy the requirements of Rule 4B and do not satisfy the three-part due process analysis of Simmons v. State (1983), 206 Mont. 264, 271, 670 P.2d 1372, 1376.

As the Court noted in Simmons, 670 P.2d at 1380:

> Interstate communication is an almost inevitable accompaniment to doing business in the modern world, and cannot by itself be considered a "contact" for justifying the exercise of personal jurisdiction.

21

The few phone contacts and mailings of Wells Fargo after 1985 do not provide crucial minimum contacts. The claims of the plaintiffs in its complaint do not arise out of Wells Fargo's Montana contacts. The complaint alleges that defendant Wells Fargo refused to provide the plaintiffs with an opportunity to repurchase the debt on the same terms as Holly. The rationale that these claims purportedly arose while Wells Fargo "controlled" the Montana refinery in 1983 and 1984 is irrelevant. Finally, it is the plaintiffs' burden to demonstrate that jurisdiction over Wells Fargo is reasonable. According to the assertion of Wells Fargo there is not one witness in Montana, all witnesses are located elsewhere.

The Montana courts also do not have specific jurisdiction over Holly in light of the plaintiffs' complaint. The complaint does not establish that any of the claims arose out of Holly doing business in Montana, fails to allege any tort that Holly committed accrued in Montana and fails to establish that Holly itself owns any Montana property. Finally, this action filed by the plaintiffs has a strong suggestion of forum-shopping for a friendly Montana jury receptive to its claims and should not be allowed to proceed in the courts of this State.

_____
Justice